IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| v. | : | DATE FILED: |
| STEPHEN KISH | : | VIOLATIONS:<br>18 U.S.C. § 666(a)(1)(A), (b) (theft from organization receiving federal funds - 1 count) |
| | : | 18 U.S.C. § 1343 (wire fraud - 1 count) |
| | : | 18 U.S.C. § 1957 (money laundering – 1 count) |
| | : | 18 U.S.C. § 2 (aiding and abetting)<br>Notices of forfeiture |

## INFORMATION

### COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

### BACKGROUND

At all times material to this information:

1. The Southeastern Pennsylvania Transportation Agency ("SEPTA") was a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the states of Delaware and New Jersey.

2. SEPTA was an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance.

3. SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to management level employees working in SEPTA's Bridges and Buildings Department ("BBD"). The BBD was responsible for maintaining, repairing, and renovating SEPTA facilities throughout Philadelphia. SEPTA provided written rules and procedures to the BBD employees concerning the use of these cards.

4. SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those items and they were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order ("PO") process.

5. Consistent with the purpose of the P-Cards, SEPTA rules further limited the use of the cards. Beginning in or around 2017, the limits for individual P-Cards were (1) a maximum of $1,000 for a single transaction; (2) a maximum of $4,000 for daily purchases; and (3) no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple smaller purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

6. Defendant STEPHEN KISH was a Director of Maintenance in SEPTA's BBD. In that position, he supervised other managers and employees in the BBD.

7. Mark Irvello, charged elsewhere, was the owner and operator of MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI"),

located at 7343 West Chester Pike in Upper Darby, Pennsylvania. MSI sold tools and other construction products to various customers, including SEPTA, through employees in the BBD.

8. Stanley Woloff, charged elsewhere, was the owner and operator of Advantage Industrial Supply ("AIS"), located at 2137 East Tioga Street in Philadelphia, Pennsylvania. AIS sold industrial supplies and other products to various customers, including SEPTA, through employees in the BBD.

9. David Abell, Rodney Martinez, Jesse Fleck, Peter Brauner, James Turner, and John Brady, all charged elsewhere, along with individuals known to the Unites States Attorney and identified here as Manager #1, Manager #2, Manager #3, and Manager #4, were managers in SEPTA's BBD. Defendant STEPHEN KISH, along with Abell, Martinez, Fleck, Brauner, Turner, Brady, Manager #1, Manager #2, Manager #3, and Manager #4, were agents of SEPTA who were issued P-cards and were trusted to use those cards to make work-related purchases on behalf of SEPTA. These managers supervised numerous employees in the BBD and held the following positions:

      a. David Abell was a Senior Director of Maintenance;

      b. Rodney Martinez was a Senior Director of Maintenance;

      c. Jesse Fleck was a Director of Maintenance;

      d. James Turner was a Maintenance Manager;

      e. Peter Brauner was a Maintenance Manager;

      f. John Brady was a Maintenance Manager;

      g. Manager #1 was a Maintenance Manager;

      h. Manager #2 was a Maintenance Manager;

      i.      Manager #3 was a Maintenance Manager; and

      j.      Manager #4 was a Maintenance Manager.

## THE ORIGIN AND HISTORY OF THE FRAUD AND BRIBERY SCHEME

10.     In or about 2013, David Abell separately agreed, first with Mark Irvello of MSI, and then with Stanley Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

11.     David Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD, including those identified above in paragraph 9, to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS.

12.     After agreeing to engage in this scheme, David Abell regularly solicited and demanded cash payments from the vendors. Mark Irvello and Stanley Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not

provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

13. David Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then billed SEPTA for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

14. Working with David Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

15. Mark Irvello and Stanley Woloff provided David Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

16. Approximately one year before David Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud

scheme.

17. Vendors Mark Irvello and Stanley Woloff then made regular cash payments to David Abell and Rodney Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

18. Several other SEPTA BBD managers, including defendant STEPHEN KISH and those identified above in paragraph 9, engaged in similar fraud activity with vendors Mark Irvello and Stanley Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors.

19. Vendors Mark Irvello and Stanley Woloff provided the cash and other items to the SEPTA managers as requested, both to generate fraud proceeds for themselves and to ensure that they continued to obtain and increase business from SEPTA.

20. From in or about 2013 through in or about 2019, vendors Mark Irvello and Stanley Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000.

## THE DEFENDANT'S INVOLVEMENT IN THE SCHEME

21. Beginning in or about late 2013, defendant STEPHEN KISH separately asked both Mark Irvello and Stanley Woloff to provide him with personal products and cash at no cost to defendant KISH. Irvello and Woloff agreed to provide defendant KISH with those personal products and cash. Defendant KISH and the vendors understood and agreed that the vendors would use the SEPTA P-Cards to fraudulently bill SEPTA for those personal products and cash and generate additional fraud proceeds for the vendors, in the manner discussed above in paragraph 13.

22. From in or about late 2013 through in or about June 2019, as part of this scheme, defendant STEPHEN KISH obtained from Mark Irvello and Stanley Woloff numerous personal items and cash that Irvello and Woloff fraudulently billed to SEPTA through the P-Card system. The total value of those items and the cash was at least $259,000, resulting in at least $353,000 in fraudulent billing to SEPTA.

23. In particular, at the direction of defendant STEPHEN KISH, Mark Irvello purchased for defendant KISH approximately $215,000 in the form of gold bullion, gold coins, and other precious metals. The purchases included several American Gold Eagle Coins, Gold American Buffalo Coins, South African Gold Krugerrand Coins, Canadian Gold Maple Leaf Coins, Royal Canadian Mint Gold Bars, and PAMP Suisse Gold Bars. Defendant KISH also obtained from Stanley Woloff thousands of dollars in cash and personal products, such as a gas grill.

24. In or about June 2019, defendant STEPHEN KISH attempted to conceal the scheme from authorities by having Peter Brauner purchase from eBay one of the gold coins

(a Canadian Mint Gold Bar for approximately $4,272) that defendant KISH had previously obtained from Mark Irvello as part of the scheme. Defendant KISH then provided the coin to Irvello so that Irvello could make it appear that he had purchased that coin for himself.

25. From in or about late 2013 through in or about June 2019, in the Eastern District of Pennsylvania and elsewhere, defendant

**STEPHEN KISH,**

an agent of SEPTA, an organization, and an agency of a state government, which received annual benefits from 2013 through 2019 in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance, knowingly embezzled, stole, obtained by fraud, and otherwise without authority, knowingly converted, to the use of any person other than the rightful owner, and intentionally misapplied, and aided and abetted the embezzlement, stealing, obtaining by fraud, conversion, and misapplication of, property that was valued at more than $5,000 and was owned by, and under the care, custody, and control of SEPTA.

In violation of Title 18, United States Code, Sections 666(a)(1)(A), (b) and 2.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 24 of Count One of this information are incorporated here.

2. From in or about late 2013 through in or about June 2019, in the Eastern District of Pennsylvania and elsewhere, defendant

**STEPHEN KISH,**

alone and with co-schemers known to the United States Attorney, devised and intended to devise a scheme to defraud and to obtain money and property of SEPTA by means of false and fraudulent pretenses, representations, and promises.

3. On or about November 26, 2018, in the Eastern District of Pennsylvania and elsewhere, defendant

**STEPHEN KISH,**

alone and with co-schemers known to the United States Attorney, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce signals and sounds travelling from the Eastern District of Pennsylvania to eBay servers located outside of Pennsylvania for Mark Irvello's purchase from eBay, for approximately $3,744, of American Eagle Gold Coins for defendant KISH.

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 24 of Count One of this Information are incorporated here.

2. From in or about June 2017 through in or about June 2018, in numerous transactions with precious metal dealers, defendant STEPHEN KISH sold, for approximately $179,000, gold bullion, gold coins, and other precious metals that he had obtained from Mark Irvello as part of the fraud scheme described in this information. During that same time, defendant KISH deposited those fraud proceeds in his personal bank account at American Heritage Bank ("the American Heritage Account").

3. American Heritage Bank is a financial institution as defined in Title 18, United States Code, Section 1956, and Title 31, United States Code, Section 5312(a)(2).

4. On or about June 1, 2018, defendant STEPHEN KISH purchased the real property located at 75 Ridge Road, Easton, Pennsylvania ("the Ridge Road property), with funds contained in his American Heritage Account that were obtained from the sales of precious metals which were proceeds of the fraud scheme described in this information. In particular, defendant KISH caused American Heritage Bank to issue an official check for $137,099.50, made payable to A.A., a title company, for the purchase of the Ridge Road property.

5. On or about June 1, 2018, in the Eastern District of Pennsylvania and elsewhere, defendant

**STEPHEN KISH**

knowingly engaged in and willfully caused a monetary transaction, by and through a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the transfer and exchange of funds and a monetary instrument, such property having been derived from specified unlawful activities, that is, theft from an organization receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(A), and wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF FORFEITURE NO. 1

**THE UNITED STATES FURTHER CHARGES THAT:**

1. As a result of the violation of Title 18, United States Code, Section 666(a)(1)(A), (b), set forth in this information, defendant

**STEPHEN KISH**

shall forfeit to the United States of America any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such a violation, including, but not limited to, the sum of $259,019.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(3)(A).

## NOTICE OF FORFEITURE NO. 2

THE UNITED STATES FURTHER CHARGES THAT:

1. As a result of the violation of Title 18, United States Code, Section 1343, set forth in this information, defendant

**STEPHEN KISH**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of $259,019.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

## NOTICE OF FORFEITURE NO. 3

THE UNITED STATES FURTHER CHARGES THAT:

1. As a result of the violation of Title 18, United States Code, Section 1957, set forth in this information, defendant

**STEPHEN KISH**

shall forfeit to the United States of America any property real or personal, involved in such offense, or any property traceable to such property, including, but not limited to, the sum of $168,198.93, representing proceeds from the sale of real property known as 75 Ridge Road, Easton, PA.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(1).

_____
JENNIFER ARBITTIER WILLIAMS
ACTING UNITED STATES ATTORNEY

*No.*\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

Vs.

STEPHEN KISH

**INFORMATION**
Count(s)
**18 U.S.C. § 666(a)(1)(A), (b) (theft from organization receiving federal funds - 1 count)
18 U.S.C. § 1343 (wire fraud - 1 count)
18 U.S.C. § 1957 (money laundering – 1 count)
18 U.S.C. § 2 (aiding and abetting)
Notices of forfeiture**

A true bill.

_____
Foreman

Filed in open court this _____day,
Of _____A.D. 20_____

_____
Clerk

Bail, $_____