**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 21-309** |
| **STEPHEN KISH** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Assistant United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

**I.     PRELIMINARY STATEMENT**

Defendant Stephen Kish was the most prolific of the SEPTA employee participants in a fraud scheme that resulted in almost $900,000 in losses to SEPTA. Kish and other managers in SEPTA's Bridges and Buildings Department ("BBD") obtained cash and personal products from corrupt vendors who falsely billed SEPTA to cover the payments to the managers. Kish's fraud was extensive, as he was responsible for more than $353,000 in losses to SEPTA, from which he pocketed more than $259,000. As one of the highest-level managers in the BBD, Kish should have known better than to engage in criminal behavior that corrupted his department. This scheme persisted for at least six years and caused tremendous monetary and psychic damage to SEPTA, its employees, and the citizens who fund SEPTA through the payment of taxes and ridership fares. For

all the reasons discussed below, and considering the other sentences imposed in this case, the government recommends a sentence at the higher end of the guideline range of 33 to 41 months in prison.

## II.   SUMMARY OF THE CRIMINAL ACTIVITY

### A.   Introduction

The charges arose from the defendant's participation in a fraud scheme involving managers in the BBD of SEPTA and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. The defendant, along with Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To cover cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss to SEPTA is approximately $900,000.

### B.   General Background Facts

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as

2

well as service between the States of Delaware and New Jersey. SEPTA is an

organization, and an agency of a state government, which received annual benefits in

excess of $10,000 under federal programs involving grants, contracts, subsidies, loans,

guarantees, and other forms of federal assistance. In fact, in each of the years of the

charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued

"procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to

managers working in SEPTA's BBD. The managers worked at various jobsites where

SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had

established written rules and procedures that were provided to these employees

concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to

purchase materials and equipment for jobsites when there was an emergency need for

those materials and equipment that were not available in SEPTA's stock system. Under

SEPTA rules, most materials for a jobsite should have been purchased in advance of the

project through the purchase order process. The SEPTA Procurement Card Procedures

Manual ("the Manual") specifically provided that the procurement card program was "not

an alternative to, nor is it intended to circumvent, the normal procurement policies and

procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the

Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2)

3

$4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### C.  The Fraud Activity

#### 1.  The Conduct of the Scheme

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello. AIS was owned and operated by Stanley Woloff.

The scheme began around 2013 when David Abell separately agreed, first with Irvello of MSI, and then with Woloff of AIS (collectively "the vendors"), to engage with

each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, Abell regularly solicited and demanded cash payments from the vendors. Irvello and Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

Abell identified for the vendors the items for which to charge SEPTA on the P-

5

Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then falsely billed SEPTA for products that they did not provide to SEPTA. The bills appeared legitimate on their face because they were for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

Approximately one year before Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect

of the bribery and fraud scheme.

Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Beginning on or about May 25, 2016, when Abell left the employment of SEPTA, Irvello and Woloff continued the fraud scheme with Rodney Martinez. That is, Martinez regularly solicited cash payments from Irvello and Woloff who provided cash to Martinez and fraudulently billed SEPTA through the P-Cards to cover the cash payments and the defendant's share of the fraud proceeds.

Around this time, Martinez invited defendant Jesse Fleck to join the scheme with Irvello and Woloff. At the request of Martinez, Fleck helped identify the items for which Irvello and Woloff would falsely bill SEPTA. Fleck then shared, in part, in the cash proceeds he obtained from Irvello and Woloff.

Several other SEPTA BBD managers, including Kish, engaged in similar fraud activity with Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors.

From in or about 2013 through in or about 2019, Irvello and Woloff, through their

companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000.

## 2. **Defendant Stephen Kish's Involvement in the Scheme**

Stephen Kish was a high-level manager in the BBD, specifically the Director of Maintenance, just below the Senior Director of Maintenance. He was responsible for helping to lead a division that included hundreds of employees.

Beginning in or about late 2013, Kish separately asked both Irvello and Woloff to provide him with personal products and cash at no cost to Kish. Irvello and Woloff agreed to do so. Kish and the vendors understood and agreed that the vendors would use the SEPTA P-Cards to fraudulently bill SEPTA for those personal products and cash and generate additional fraud proceeds for the vendors, in the manner discussed in this memorandum.

From in or about late 2013 through in or about June 2019, as part of this scheme, Kish obtained from Irvello and Woloff numerous personal items and cash that Irvello and Woloff fraudulently billed to SEPTA through the P-Card system. The total value of those items and the cash was approximately $259,019, resulting in approximately $353,488 in fraudulent billing to SEPTA.

In particular, Irvello purchased for Kish approximately $215,000 in the form of gold bullion, gold coins, and other precious metals. The purchases included several American Gold Eagle Coins, Gold American Buffalo Coins, South African Gold

Krugerrand Coins, Canadian Gold Maple Leaf Coins, Royal Canadian Mint Gold Bars, and PAMP Suisse Gold Bars. Kish also obtained from Woloff thousands of dollars in cash and personal products, such as a gas grill.

In or about June 2019, Kish attempted to conceal the scheme from authorities by having SEPTA manager Peter Brauner purchase from eBay one of the gold coins (a Canadian Mint Gold Bar for approximately $4,272) that Kish had previously obtained from Irvello as part of the scheme. Kish then provided the coin to Irvello so that Irvello could make it appear that he had purchased that coin for himself.

### D. The Money Laundering Activity

As discussed above, as part of the fraud scheme charged in this case, Irvello regularly paid Kish his share of the proceeds from SEPTA in the form of precious metals that Irvello obtained from eBay. From in or about June 2017 through in or about June 2018, in numerous transactions with precious metal dealers, Kish sold, for approximately $179,000, gold bullion, gold coins, and other precious metals that he had obtained from Irvello as part of the fraud scheme described in this memorandum. During that same time, Kish deposited those fraud proceeds in his personal bank account at American Heritage Bank ("the American Heritage Account"). American Heritage Bank is a financial institution as defined in 18 U.S.C. § 1956, and 31 U.S.C. § 5312(a)(2).

On June 1, 2018, Kish purchased the real property located at 75 Ridge Road, Easton, Pennsylvania ("the Ridge Road property), with funds contained in his American Heritage Account that were obtained from the sales of precious metals which were

proceeds of the fraud scheme described in this memorandum, in violation of specified unlawful activity, namely, 18 U.S.C. § 666(a)(1)(A) (federal program theft), and 18 U.S.C. § 1343 (wire fraud). Kish caused American Heritage Bank to issue an official check for $137,099.50, made payable to A.A., a title company, for the purchase of the Ridge Road property.

## III.    STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (theft from a program receiving federal funds and aiding and abetting), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count Two (wire fraud), 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Three (money laundering), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine (or twice the amount of the criminally derived property involved in the money laundering transaction), and a $100 special assessment.

Total Maximum Sentence is: 40 years' imprisonment, a three-year period of supervised release, a $750,000 fine (or a $500,000 fine plus twice the amount of the criminally derived property involved in the money laundering transaction), and a $300 special assessment. Full restitution of approximately $353,488 also shall be ordered. Forfeiture of approximately $259,019 which represents all proceeds from the theft and fraud offenses, and/or all property involved in the money laundering offense also shall be ordered.

IV.     **SENTENCING GUIDELINES**

The government agrees with the guideline calculation set forth in the Presentence Investigation Report ("PSR"). The guideline range is controlled here by Counts One and Two, charging theft and wire fraud. Under U.S.S.G. § 2B1.1(a)(1), the base offense level for the defendant's conduct is 7. Under U.S.S.G. § 2B1.1(b)(1)(G), the fraud loss caused and intended to be caused in furtherance of the criminal activity undertaken by the defendant was more than $250,000 but less than $550,000, resulting in a 12-level increase to the base offense level. Under U.S.S.G. § 3B1.3, the defendant abused a position of public trust, resulting in a 2-level increase to his base offense level. Under U.S.S.G. § 3C1.1, the defendant attempted to obstruct justice by trying to hide illicit transactions through a co-defendant, resulting in a 2-level increase to his base offense level. Because the defendant demonstrated acceptance of responsibility for his offense and has done so in a timely manner, he receives a 3-level downward adjustment under U.S.S.G. § 3E1.1. This results in a total offense level of 20. With a criminal history category of I, the defendant's guideline range is 33 to 41 months in prison.[1]

---

[1] The government notes that the defendant does not receive any increase in the applicable guideline range for his money laundering conviction because the Chapter Three adjustments in the guidelines that apply to the fraud charges discussed above do not apply to the money laundering conduct. *See* U.S.S.G. § 2S1.1(a)(1), Application Note 2(C), and *United States v. Capps,* 977 F.3d 250, 254-57 (3d Cir. 2020).

**Consideration of the 3553(a) Factors**

**(1)      The nature and circumstances of the offense**

The nature and circumstances of Kish's criminal conduct are extremely serious and troublesome. As a Director of Maintenance, Kish was one of the highest-level managers in the BBD and was responsible for leading hundreds of employees who worked in his division. He owed SEPTA, his fellow employees, and the taxpayers a duty of loyalty and integrity. Instead of conducting himself appropriately, he abused that position of responsibility by defrauding SEPTA of hundreds of thousands of dollars. He was the most aggressive participant from SEPTA in the scheme, convincing Irvello to pay him in gold and other precious metals and accumulating over $259,000 in fraud proceeds. In total, the scheme caused losses to SEPTA of approximately $900,000. If the scheme had not been uncovered, it would still be going on today.

Crimes like this do tremendous damage to federally funded agencies like SEPTA. They cause the taxpayers and citizens of Philadelphia to lose faith in the integrity of one of the largest metropolitan transportation organizations in the country. People are already cynical about government and government-funded entities like SEPTA, and internal fraud and bribery activity as charged in this and the related cases, fans the flames of this cynicism. Internally at SEPTA, these crimes demoralize the dedicated, honest, and hard-working employees who worked with and for the corrupt supervisors charged in this case. SEPTA has expended and will continue to expend substantial financial and psychic resources trying to repair the damage from the fraud and ensure that it does not happen

12

again.

SEPTA provided a victim impact statement, signed by Denise S. Wolf,

Inspector General, and Robin Deveney, Director, Procurement & Supply Chain

Management Audit, in which they expressed the ways in which this crime damaged the

organization:

> The criminal fraud executed by nine bad actors damaged this organization, its
> employees, and the members of the public who rely on us for their transportation
> needs. To put it simply, it hurt a lot. We still feel the impact --- financial loss,
> decreased morale, and damaged reputation -- and the effects of this fraud on the
> organization are not going away any time soon. SEPTA is not a for-profit
> enterprise; it relies heavily on funding from taxpayers to subsidize the fares
> received from riders. We depend on the integrity of each of our employees to
> steward these public funds and provide transit services to millions of riders. When
> employees – even if only a small number -- violate this public trust, the damage to
> our organization is tremendous.

This was obviously a serious crime that had a substantial impact on the victim, and the

government's sentencing recommendation at the higher end of the guideline range

appropriately accounts for this sentencing factor -- especially since, as noted above, the

defendant did not receive any increase to his guideline range for his money laundering

conviction.

**(2)     The history and characteristics of the defendant.**

Stephen Kish is a 66-year-old man who had a normal upbringing and successful

career at SEPTA. According to information from the defendant and his psychologist, the

defendant suffers from anxiety and depression that, understandably, has been exacerbated

by this criminal prosecution. His psychologist offers that Kish's criminal conduct was

13

inconsistent with his prior history, but that once he got started with the fraud, it was difficult for him to stop. Kish stated that stealing from SEPTA became "like taking a drug," and his psychologist elaborated that "he needed a frequent 'fix' to keep it going." These explanations are not mitigating and could apply to most of the defendants in this case. Those defendants also had little to know criminal history, and they seized on an opportunity to profit through an ongoing fraud scheme and did not stop. Kish's repeated and extensive fraud in this case over many years was not mitigating; rather, it was reprehensible and reflects poorly on his history and characteristics. The defendant does not deserve leniency on this basis.

While Kish ultimately admitted to his misconduct and expressed remorse, he was the last defendant in this case to do so, having made every effort to avoid confronting the reality of his conduct and the consequences that would follow. The government's recommended sentence properly accounts for the defendant's history and characteristics.

**(3)   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4)   The need to afford adequate deterrence to criminal conduct, and to <u>protect the public from further crimes of the defendant</u>.**

A prison sentence at the higher end of the guideline range as recommended by the government under all the facts and circumstances of this case would appropriately punish the defendant for victimizing SEPTA through his fraud scheme. The recommended sentence would promote respect for the law and deter public employees and business who

serve public agencies from engaging in this type of criminal activity. Crimes like this are difficult to detect, as evidenced by the length of time that the defendant and others engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in the area of white-collar crime.  For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals."  *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses").  In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to Kish and the public that the justice system will not tolerate this type of fraud activity. The government also recognizes that the defendant is losing his pension because of his crimes here. The sentence recommended by the government, which amounts to significant prison time for this first-time offender, would send the appropriate message to the community that anyone who engages in fraud, especially involving a public entity, will suffer serious consequences.

**(5)    The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Considering all the facts and circumstances discussed in this memorandum and elsewhere, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. The recommended sentence fairly considers this defendant's conduct and the circumstances of his case and would be consistent with the sentences of defendants in other cases of this nature, including that of other defendants in this case.

Considering the relative culpability of the defendants in this scheme, David Abell,

Rodney Martinez, and Stephen Kish are at the higher level of culpability among the SEPTA employees. David Abell was the Senior Director of Maintenance and the originator of the scheme. He brought Martinez into the scheme who then took over Abell's role as Senior Director of Maintenance and helped Abell continue to profit from the scheme after Abell left his high-ranking position and continued with SEPTA as a contractor. Abell received a sentence of 60 months in prison. Martinez received a sentence of 30 months, which was below the guideline range based on his individual circumstances. Both Abell and Martinez also faced higher guideline ranges than Kish because they pled guilty to bribery.

Kish was a Director of Maintenance, just below Abell and Martinez in the SEPTA BBD management hierarchy, and above the other managers charged in this scheme. Kish was the most prolific SEPTA manager in the fraud, obtaining over $259,000 in proceeds, much of it in the form of gold.  His criminal behavior also involved money laundering and obstruction of justice.

The corrupt vendors in this case, Irvello and Woloff, should be considered more culpable than the lower-level SEPTA participants in the scheme because their conduct was far more extensive and involved repeated fraud and bribery activity over several years. While they did not abuse the trust of the public and SEPTA as did the SEPTA managers, Irvello and Woloff were a substantial engine driving the criminal activity in the multiple schemes involved in these cases. Their culpability thus is closer to that of the higher-level SEPTA employees, but without the abuse of the public trust that represents

17

the most abhorrent aspect of the criminal activity in this case. Irvello received a sentence of 30 months, that was also driven by his individual circumstances.

The sentence recommended by the government in this case properly accounts for the relative culpability of Kish among all the defendants in this prosecution. In particular, Kish should receive a longer sentence than that imposed on Irvello and Martinez given the different posture of those defendants in this litigation.

      **(7)**    <u>**The need to provide restitution to any victims of the offense.**</u>

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Under the terms of the plea agreement, the defendant should be ordered to pay restitution and forfeiture as set forth in the government's forfeiture motion. The defendant should be given credit for the funds seized from him as discussed in this memorandum.

## V.    <u>GOVERNMENT'S SENTENCING RECOMMENDATION</u>

For all the reasons set forth above, the government requests that this Court impose a prison sentence at the higher end of the range of 33-41 months. This Court should also impose restitution and forfeiture as noted above. Such a sentence would properly consider all the sentencing factors in the context of this case, particularly the seriousness of the offense and the need to promote respect for the law and deter others

from engaging in similar illegal conduct.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*s/ Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and served via email upon:

> Steve Patrizio, Esquire
> 1500 John F. Kennedy Boulevard
> 2 Penn Center Suite 1205
> Philadelphia, PA 19102
> E-mail: spatrizio@dpesq.com


> */s Louis D. Lappen*
> LOUIS D. LAPPEN
> Assistant United States Attorney



Date:  September 16, 2022